HOLMES F. CROUCH AND IRMA J. CROUCH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Crouch v. Commissioner
Docket No. 8579-88
United States Tax Court
T.C. Memo 1990-309; 1990 Tax Ct. Memo LEXIS 327; 59 T.C.M. (CCH) 938; T.C.M. (RIA) 90309; June 20, 1990, Filed *327 Decision will be entered under Rule 155. Alexander F. Eagle III, for the petitioners. Steven J. Sibley, for the responden SCOTT, Judge. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION Respondent, in his notices of deficiency, determined deficiencies in petitioners' Federal income taxes and additions to tax for the following years and in the following amounts: Additions To Tax
[1] Sections [2] *328 Tax Year(s) Ended Deficiency
6653(a)
6653(b) *
6661
December 31, 1978
$ 3,008 $ 150
0
0
December 31, 1980
$ 3,530 $ 177
0
0
December 31, 1981
$ 24,814 0
$ 12,407
0
December 31, 1982
$ 20,893 0
$ 10,447
$ 5,223
December 31, 1983
$ 20,729 0
$ 10,365
$ 5,182 In his answer, respondent alleged that petitioners are liable for an addition to tax under section 6653(b)(2) for their 1982 and 1983 taxable years in an amount equal to 50 percent of the interest due on that portion of the deficiency which is attributable to fraud. Respondent also alleged, in the alternative, that petitioners are liable for additions to tax under section 6653(a)(1) and section 6653(a)(2) for each of their 1981, 1982, and 1983 taxable years. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision: (1) whether petitioners are entitled to deduct, as research and development expenses under section 174, amounts paid by petitioner Holmes F. Crouch in connection with the production of tax guides; (2) whether petitioners are liable for additions to tax under section 6653(b) for their 1981 taxable year and sections 6653(b)(1) and (2) *329 for their 1982 and 1983 taxable years; (3) whether petitioners are liable for additions to tax under section 6653(a) for their 1978 and 1980 taxable years and in the alternative to the addition to tax for fraud under sections 6653(a)(1) and (2) for their 1981, 1982, and 1983 taxable years; and (4) whether petitioners substantially understated their income tax liability for their 1982 and 1983 taxable years and are thus liable for additions to tax under section 6661. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners were residents of Saratoga, California at the time of the filing of the petition herein. Petitioners reported their income and filed joint Federal income tax returns for the taxable years 1978, 1980, 1981, 1982, and 1983 utilizing the cash method of accounting. Petitioner Holmes F. Crouch (petitioner or Mr. Crouch) was born on January 31, 1919. Upon completion of high school, Mr. Crouch attended the United States Coast Guard Academy in New London, Connecticut, where he received a bachelor's degree in marine engineering and navigation. He then served 12 years of active duty in the Coast Guard and retired in 1952. Upon retiring *330 from the Coast Guard, petitioner became a research engineer with the California Research and Development Company at Livermore, California, a subsidiary of the University of California at Berkeley. Petitioner acted as a proposal writer and project manager/project engineer with respect to proposed aerospace and defense products which were, upon funding, developed for the United States government. During this period of employment, petitioner obtained a master's degree in nuclear engineering and completed his course work towards a Ph.D. in material sciences. In the early 1970s, as a result of cutbacks in the defense industry, petitioner was laid off from his job. He was unemployed for an entire year and therefore changed careers. Petitioner had previously taken several courses in accounting and business management, as well as one course in tax work. Petitioner was also president of an organization which was instrumental in seeking property tax relief in the State of California. However, petitioner had no prior experience in the preparation of tax returns as a tax return preparer for others. In 1972, petitioner studied for and passed the Internal Revenue Service enrollment examination. *331 Petitioner became eligible to practice before the Internal Revenue Service in 1972. After becoming an enrolled agent, Mr. Crouch conducted his tax practice out of petitioners' home in Saratoga, California. Petitioner Irma J. Crouch (Mrs. Crouch) was born on January 7, 1921. Upon completion of high school, Mrs. Crouch obtained a bachelor's degree in social sciences from Stanford University and a master's degree in education from Stanford University. Mrs. Crouch married petitioner on May 20, 1955 and moved to California where she was employed as a procedures analyst by an aircraft company. Mr. Crouch had been married previously but was divorced from his first wife on March 4, 1955. Mrs. Crouch, sometime after 1972, left her job with the aircraft company and assisted Mr. Crouch in his tax practice. Mrs. Crouch had no training in the area of tax law and, therefore, never prepared tax returns. She performed general secretarial and maintenance tasks. She sometimes would babysit the children of Mr. Crouch's clients. During the period Mr. Crouch was employed in the defense industry, he was a wage earner and paid employment taxes, under section 3101, on the wages he received. After *332 leaving the employ of the defense industry, Mr. Crouch was required, under section 1401, to pay a tax on the self-employment income he earned through his tax return preparation service. On August 14, 1971, Mr. Crouch received a letter from the Social Security Administration which informed him that he had accumulated 40 quarters of coverage under the social security system and thus had attained "insured status." Mrs. Crouch also received a letter from the Social Security Administration stating that she had attained insured status. Mr. Crouch claims that shortly after he was laid off from his job and became self-employed, he became philosophically opposed to the mandatory inclusion of self-employed persons in the social security system, especially if those persons were able to provide for their own retirement. Mr. Crouch learned through his research that, prior to 1950, self-employed persons were not included in the social security system. [3] *333 Some of Mr. Crouch's self-employed clients told him that they were displeased at being involuntarily included within the social security system. Prior to December 31, 1976, section 1402(h) provided that an individual could file an application for exemption from the tax on self-employment income, if he was a member of a recognized religious sect and was, by reason of the established tenets of such sect, conscientiously opposed to the acceptance of any private or public insurance that pays death, disability, old-age or retirement benefits. On July 1, 1974, Mr. Crouch filed an "Application for Exemption from Tax on Self-Employment Income and Waiver of Benefits," Form 4029, with the Fresno Service Center of the Internal Revenue Service, on which he requested exemption from the tax on self-employment *334 income and attempted to waive all rights to receive social security benefits. Mr. Crouch certified, under penalties of perjury, that he had been a nonsectarian independent since March 11, 1970, and was conscientiously opposed to the acceptance of social security benefits. The application for exemption was disapproved on July 8, 1974. Mr. Crouch subsequently filed a second Form 4029, dated August 13, 1974, with the Internal Revenue Service. On this form Mr. Crouch certified, under penalties of perjury, that he had been a member of a religious group, the Universal Life Church, at Modesto, California (the Universal Life Church), since November 24, 1971. He further certified that, because of his adherence to the tenets and teachings of the Universal Life Church, he was conscientiously opposed to the acceptance of social security benefits and attempted to waive all rights to receive such benefits. At the time he filed the second Form 4029, Mr. Crouch was not, and had never been, associated with the Universal Life Church. The second Form 4029 was disapproved on March 21, 1975. On May 1, 1975, Mr. Crouch executed, under penalties of perjury, a third Form 4029, in which he again certified *335 that he was a member of the Universal Life Church and, in addition, raised several constitutional issues with respect to the instructions contained thereon. On January 1, 1976, Mr. Crouch executed, under penalties of perjury, a fourth Form 4029, which was received by the Fresno Service Center on January 16, 1976. On the fourth Form 4029, Mr. Crouch did not claim to be a member of any particular religious sect, but merely referenced the prior Forms 4029 which he had filed. On September 25, 1975, after the Internal Revenue Service denied (or did not act on) his claims for refund of the self-employment taxes, which he paid for his 1972, 1973, and 1974 tax years, Mr. Crouch filed a complaint in the United States District Court for the Northern District of California (the District Court) seeking such refund (the self-employment tax action). Mr. Crouch also sought to have several clauses contained within section 1402(h) declared unconstitutional and to enjoin respondent from denying him an exemption from self-employment tax. On July 29, 1976, Mr. Crouch wrote a letter to Congressman Norman Y. Mineta (Congressman Mineta) in which he stated that, for personal and religious reasons, he had *336 unsuccessfully, "applied four times for exemptions from [self-employment] tax, in exchange for waiving all rights to ever receiving any benefits from Social Security." Mr. Crouch also requested that Congressman Mineta forward several inquiries regarding the social security system, and particularly exemption therefrom on religious grounds, to the Secretary of Health, Education, and Welfare. Congressman Mineta complied with Mr. Crouch's request and, on September 9, 1976, forwarded to petitioner a letter he had received from Pasquale F. Caligiuri, Director of the Bureau of Retirement and Survivors Insurance for the Social Security Administration, which contained answers to each of Mr. Crouch's questions. On December 14, 1976, the District Court granted the United States government's motion for summary judgment against Mr. Crouch in the self-employment tax action. The District Court dismissed with prejudice Mr. Crouch's cause of action and complaint. On February 11, 1977, Mr. Crouch appealed the District Court's judgment to the United States Court of Appeals for the Ninth Circuit. The Ninth Circuit affirmed the judgment of the District Court and Mr. Crouch filed a Petition for Writ *337 of Certiorari with the Supreme Court of the United States, which was denied on October 1, 1979. Mr. Crouch represented himself both in the District Court and Ninth Circuit proceedings. In 1981, petitioner contacted the office of his local representative, Congressman Mineta, and stated that he agreed with certain suggestions then President Reagan had made about trying to strengthen the social security system. He asked whether he could make a one-time lump-sum gift of all his future social security benefits to the social security system. The Congressman's senior staff assistant contacted the Social Security Administration which informed her that Mr. Crouch would have to actually collect the benefits, and then turn them back to the system, if he wished to make a gift of his benefits. Congressman Mineta's assistant communicated this information to Mr. Crouch. Mr. Crouch also contacted a local office of the Social Security Administration and was informed that there were no procedures for handling a lump-sum gift of social security benefits. After receiving the information stated above, Mr. Crouch began to research the Social Security Act in an attempt to locate a provision which would *338 allow him to renounce his social security benefits. During his research, Mr. Crouch found section 401(i)(1) of the Social Security Act, 42 U.S.C. section 401(i) (1973), which authorizes the Managing Trustee of the Federal Old-Age and Survivors Insurance Trust Fund (the Social Security Trust Fund), "to accept on behalf of the United States money gifts and bequests made unconditionally * * *," to the Social Security Trust Fund. Mr. Crouch also located section 132(g) of the Social Security Act Amendments of 1972, Pub. L. 92-603, 86 Stat. 1361, which provided that, for Federal income, gift, and estate tax purposes, any such gift or bequest, "shall be considered as a gift or bequest to or for the use of the United States and as made for exclusively public purposes." Mr. Crouch could not locate any statutory provisions or income tax regulations which specifically provided a means by which a taxpayer could renounce his entire interest in social security benefits and claim a charitable deduction under section 170 for the value of the benefits renounced. He did find section 2518, which provided that if a person made a "qualified disclaimer" of any interest in property, the Federal estate *339 and gift tax provisions would apply as if the interest had never been transferred to such person. Section 2518(a). On May 12, 1981, Mr. Crouch sent a notarized letter to President Reagan in which he purported to renounce all rights to his social security benefits. Mrs. Crouch typed this letter to President Reagan, which stated in part: Dear Mr. President: WHEREAS, on January 20, 1981 you were sworn in as President of the United States, to uphold the Constitution thereof, and to establish a "new beginning" by "changing the direction" of government; WHEREAS, I support your views wholeheartedly and conscientiously, in particular those on the right of individual self care via Amendment 9 of the Constitution; * * * WHEREAS, the Social Security System is actuarially bankrupt, is mandatory enslavement, and is morally fraudulent upon the future generations of this Nation; * * * NOW THEREFORE - 1. I, the undersigned, Holmes F. Crouch, do hereby renounce irrevocably forever all right, title, and claim to any and all Social Security benefits to which I might otherwise be entitled by virtue of my employment earnings since 1940, my self-employment earnings since 1970, and any applicable earnings *340 of my beloved wife. * * * 4. This renunciation is not a request for refund of the cumulative Social Security taxes involuntarily paid through December 31, 1980; instead, said cumulative amount, indexed for inflation, will be recaptured by me as a 1981 income tax credit under the precepts of Sections 1016 (adjustments to basis), 1033 (involuntary conversions), 1231 (property used in a trade or business), and others, of the Internal Revenue Code. 5. Henceforth, no further compulsory Social Security taxes will be paid by me, the undersigned, inasmuch as the benefits therefrom, by virtue of this irrevocable renunciation, can never be claimed. 6. I specifically request, Mr. President, that you instruct your staff, particularly your Secretaries of Treasury and Health/Welfare to assist and support the undersigned in accomplishing the tax credit indicated, and in establishing administrative procedures for tax credits for others who do not need nor want Social Security benefits.
In a letter dated May 22, 1981 addressed to Mr. Richard S. Schweiker, Secretary of Health and Human Services, Mr. Crouch stated that he had renounced all social security benefits in exchange for a one-time tax credit *341 on his 1981 return. Mr. Crouch forwarded this letter to Congressman Mineta for transmittal to Secretary Schweiker. Mr. Crouch received a letter, dated June 23, 1981, from Congressman Mineta in which the Congressman, first, confirmed that he had transmitted the letter to Secretary Schweiker and, second, thanked Mr. Crouch for his generous actions. By letter dated June 9, 1981, Mr. John A. Svahn (Mr. Svahn), then Commissioner of Social Security, notified Mr. Crouch that a response to his letter to President Reagan would be forthcoming. In response to Mr. Svahn's acknowledgement letter of June 9, 1981, Mr. Crouch sent a letter, dated June 20, 1981, to Congressman Mineta. In this letter to Congressman Mineta, Mr. Crouch stated that: Please be kind enough to transmit the attached letter to Mr. Svahn, Commissioner, Social Security Administration. A copy of it is for your files. I am serious about the matter. I intend to press ahead claiming my involuntary contributions as a tax credit on my 1981 return. I will claim the excess of benefits over contribution as a charitable deduction. Somebody has to initiate a new approach to the problem; it might as well be me.
In the attached letter *342 to Mr. Svahn, Mr. Crouch requested confirmation of certain facts as well as certain other information regarding the social security system, including the amount he had paid into the social security system (which, according to Mr. Crouch's figures, was $ 12,454), and the actuarial value of his benefits (which, according to Mr. Crouch's figures, was $ 113,682). By letter dated June 18, 1981 (two days before Mr. Crouch's request for information), Mr. Svahn informed Mr. Crouch that there was no provision in the social security laws which permitted voluntary withdrawal from the system but that there were provisions in the Internal Revenue Code (i.e., section 1402(h)) for exemption from the tax on self-employment income. Mr. Svahn suggested that Mr. Crouch contact the Internal Revenue Service if he wished to pursue the matter further. In response to Mr. Svahn's letter of June 18th, Mr. Crouch wrote Mr. Svahn on July 2, 1981, informing him that he had already attempted to withdraw from the social security system via section 1402(h), but had been unsuccessful. In this letter to Mr. Svahn, Mr. Crouch proposed that the Internal Revenue Code be amended to add new section 1404, which would *343 allow an individual who had attained the age of 62 to renounce his benefits and, in exchange, elect to "recapture" his total contributions, indexed for inflation, to the social security system. In addition to this election, the taxpayer could elect "to claim the excess of his beneficial rights to actuarial entitlement over his adjusted contributions, as a public charitable contribution under the provisions of section 170(c)(1)." After making such election, the taxpayer would be exempt from any further tax on self-employment income. Mr. Crouch also sent a copy of his proposed section 1404 to Senator William Armstrong and to Congressman Mineta who, in turn, forwarded it to Secretary Schweiker. In a letter to Mr. Crouch dated September 15, 1981, Secretary Schweiker stated that he could not support Mr. Crouch's renunciation proposal because: 1) any savings in social security disbursements would be far outweighed by the decrease in income tax revenues which would result from allowing recapture, deduction, or credit for the renounced benefits; 2) social security benefits are the major source of income for most beneficiaries and few could afford to forego their benefits in exchange for a *344 tax credit; and 3) even though a person might be well-off at the time he waives benefits, if his economic fortunes later decline, he and his family would still require assistance. By letter dated September 21, 1981, Mr. Crouch responded to Secretary Schweiker's objections by amending his proposal to require the taxpayer to show that he had made alternate arrangements for retirement. On October 5, 1981, Congressman Mineta's office received a letter from Mr. Svahn responding to the questions posed by Mr. Crouch in his June 20, 1981 letter. Mr. Svahn stated that: 1) Mr. Crouch's renunciation letter to President Reagan had arrived in his office on June 2, 1981; 2) Mr. Crouch was born on January 31, 1919; 3) Mr. Crouch's monthly retirement benefit would be approximately $ 355.50 if he retired at age 62; 4) the actuarial present value of such benefits paid over the remainder of Mr. Crouch's lifetime would be approximately $ 60,000; 5) the actuarial present value of both Mr. Crouch's and Mrs. Crouch's benefits attributable solely to Mr. Crouch's contributions would be approximately $ 105,000; 6) Mr. Crouch apparently computed his figure of $ 113,000 either by simply adding together all *345 future monthly benefits without any discount to reflect the time value of money or by adding the value of Mrs. Crouch's benefits attributable to his own benefits; 7) Mr. Crouch would be eligible for benefits, but that he had not applied for nor received such benefits; and 8) although the exact amount of any individual's contributions are not available, based on the earnings reported by Mr. Crouch to date, he paid approximately $ 6,375.59 in social security taxes from 1952 through 1979. Mr. Svahn also enclosed a chart showing the history of percentage increases in benefits. On October 12, 1981, Mr. Crouch wrote a letter to an assistant in Congressman Mineta's office in which he claimed that the amount of his contributions, as calculated by Mr. Svahn, was incorrect. Mr. Crouch requested that the Social Security Administration recalculate his contributions and actuarial benefits because he intended to claim them as a charitable contribution under section 170 on his 1981 Federal income tax return. On March 15, 1982, Mr. Crouch received a letter from the Social Security Office of Central Records Operations in Baltimore, Maryland, stating that his records would be credited with additional *346 earnings. By letter dated January 7, 1982, a local office of the Social Security Administration informed Mr. Crouch that, based on their own records and the information he provided, his monthly social security benefits would be approximately $ 439.40 beginning with the month of May 1981. Although, under section 414(a) of the Social Security Act, 42 U.S.C. sec. 414 (1982), Mr. Crouch became a fully insured individual in January 1981, he was not entitled to receive social security benefits at any time during 1981, 1982, and 1983 because he did not apply for such benefits. The maximum allowable yearly earnings which a person under 70 years old could make and also receive social security benefits for the taxable years 1981, 1982, and 1983 were $ 4,080, $ 4,440, and $ 4,920, respectively. Mr. Crouch's earnings exceeded the amount applicable in each such year. Mr. Crouch's wife from his prior marriage applied for, and began receiving social security benefits based on Mr. Crouch's earnings in 1988. Petitioners, on Schedule C "Profit or (Loss) From Business or Profession," included as a part of their joint Federal income tax return for their 1981 taxable year, reported net income in the *347 amount of $ 18,319.21 from Mr. Crouch's tax return preparation business. On Line 48 of their 1981 return, petitioners claimed that their 1981 self-employment tax liability was zero. They circled the instruction on Line 48 which directs a taxpayer to "(attach Schedule SE)." Petitioners attached a copy of Mr. Crouch's letter to President Reagan to their 1981 return and denominated such letter as "Attachment Schedule SE 1981." Similarly, on both their 1982 and 1983 returns, petitioners claimed that their self-employment tax liability was zero, even though Mr. Crouch earned net income in the amount of $ 57,617.04 for 1982 and $ 20,442.72 for 1983 from his tax return preparation business. They attached a copy of Mr. Crouch's letter to President Reagan denominated as "Attachment Schedule SE 1982," to their 1982 return and another copy of the letter to their 1983 return. On "Schedule A -- Itemized Deductions" of their 1981 joint Federal income tax return (which was executed on January 24, 1982), petitioners claimed a charitable contribution in the amount of $ 88,583 attributable to Mr. Crouch's purported renunciation of his social security benefits. Mrs. Crouch knew that petitioners were *348 claiming a charitable deduction based on Mr. Crouch's purported renunciation of his social security benefits. Mr. Crouch computed the amount of the purported contribution by multiplying his potential monthly benefit of $ 439.40 by 12 to take into account the number of months in the year and then by his life expectancy of approximately 16.8 years. Mr. Crouch derived his life expectancy from tables supplied to him by the Social Security Administration. Appearing underneath the claimed contribution reported on Schedule A was the following handwritten notation: Sec. 170(c)(1) Soc. Sec. Entitlement (62) 170(b)(1)(A)(v): 50% AGI Carryover to 1982
Petitioners claimed as a charitable contribution deduction only $ 14,647.33 of the claimed contribution of $ 88,583 in 1981 due to the 50% of adjusted gross income limitation of section 170(b). They carried the remainder, $ 73,935.67, over to their 1982 taxable year purportedly in accordance with section 170(d)(1)(A). On their 1982 return, petitioners indicated that their 1982 charitable deduction attributable to the purported contribution was limited to $ 37,181.97 and carried the remainder, $ 36,753.70, over to their 1983 tax year. On their *349 1983 return, petitioners indicated that their charitable deduction attributable to the purported contribution was limited to $ 19,695.23. In 1980, petitioner began writing a 25-title series of income tax guides (the guides), collectively entitled "ALLYEAR TAX GUIDES," in his spare time. Each guide was intended to cover a specific aspect of Federal income tax law and procedure as it affected the individual. Subjects covered by the guides included "Winning Your Audit," "Investor Gains & Losses," "Divorce and Remarriage," "Selling Your Home," and "Writing Your Will." The guides were intended to fall somewhere in between the looseleaf tax publications, issued by companies such as Commerce Clearing House and Prentice Hall, which are intended for use by professional tax practitioners, and the yearly tax guides, such as H.& R. Block and J.K. Lasser, which are intended for use by those unfamiliar with the tax law. The guides were intended for a general audience (with a slant towards professional-level taxpayers). Petitioner wrote the guides on a home computer and stored his work product on computer tape. By employing a desktop publishing system, Mr. Crouch believed he could update each *350 guide on an annual basis to take into account yearly changes in the Federal income tax laws. He could also make changes based on the comments of those to whom he had distributed or sold the guides. In addition, by using such a system, Mr. Crouch hoped to eliminate much of the editing, graphics, and design steps which a typical publisher must take when it accepts a "raw" manuscript for publishing. Eventually, he hoped to develop an up-to-date and refined master computer disk for each guide in the series which he could present, as is, to a commercial publisher for immediate publishing and distribution of the guide. In July 1980, petitioner approached a printing, graphics, and marketing firm named Hergie & Associates (Hergie) regarding services for developing a 25-title series of Federal tax guides. By letter dated December 8, 1980, Hergie informed petitioner that it would cost approximately $ 16,485 for printing and binding 1,000 to 3,000 hardcover copies of his first "prototype" book, "Selling Your Home," and that a $ 10,000 deposit would be required. On December 10, 1980, Mr. Crouch wrote a check to Hergie in the amount of $ 10,000, which was cashed by Hergie on December 11, 1980. *351 On February 3, 1981, Mr. Crouch wrote a check to Hergie in the amount $ 6,485 to cover the balance of printing costs for a hardcover version of "Selling Your Home." During the course of 1981, petitioner paid Hergie an additional $ 31,383 to cover the costs of editing, typesetting, layout, paste-up, and printing of "Capital Gains and Losses" and "Preparing Your Will." In February 1982, Mr. Crouch received an estimate of $ 4,550 from Hergie for the costs of editing, proofing, typesetting, and graphics with respect to the next two guides in his series, "Winning Your Audit" and " Divorce and Remarriage." Over the next six months, petitioner made deposits totaling $ 4,000 to cover such costs with respect to "Winning Your Audit." Petitioner paid Hergie an additional $ 4,281.50 in 1982 for miscellaneous expenses including $ 1,000 for revisions of "Winning Your Audit," $ 425 for the rough color lay-out of a three fold brochure, $ 355 for storage fees, $ 991.50 for letterheads and envelopes, and $ 35 for other supplies. Petitioner paid Hergie $ 51,276 in 1983. This figure includes $ 28,508 for the printing of 1,000 hardcover copies each of "Winning Your Audit" and "Divorce and Remarriage," *352 $ 5,800 for a revision of "Selling Your Home," and $ 6,458 for editing, graphics, and typesetting with respect to "Divorce and Remarriage." It does not, however, include amounts paid to Hergie for the destruction of certain guides (as discussed below). In 1981, Mr. Crouch began contacting marketing consultants, publishers, and booksellers in an attempt to gain financial backing for the publishing, mass marketing, and distribution of his "ALLYEAR TAX GUIDES." Although none of these organizations requested samples, petitioner sent out several copies of the hardcover guides which had already been printed as he contacted each organization. Some of these organizations made suggestions on how to best publish and distribute the guides. However, none elected to provide Mr. Crouch with the funding he requested. Petitioner also sold some of the guides to his tax clients and referrals during 1981, 1982, and 1983. In 1981, Mr. Crouch sold 52 guides. In 1982, Mr. Crouch sold six guides. In 1983, Mr. Crouch sold 10 guides. None of these incidental sales, however, were made in the ordinary course of business. In late 1982, most of the remaining copies of "Selling Your Home," "Writing Your *353 Will," and "Capital Gains and Losses" were destroyed due to their obsolescence. Mr. Crouch paid Hergie a total of $ 565 in destruction costs. On Schedule C of their 1981 return, petitioners deducted $ 47,868.21 as research and experimental expenditures under section 174(a). In addition, petitioners computed a tentative "Credit For Increasing Research Activities" under section 44F (now redesignated as section 41) in the amount of $ 3,310 and claimed $ 302 of this amount as a credit against their 1981 income tax liability. On November 12, 1982, petitioners filed a Form 1045 "Application for Tentative Refund," for their 1978 tax year on which they carried the remainder of the section 44F credit back to their 1978 taxable year and claimed a refund in the amount of $ 3,008. On Schedule C of their 1982 return, petitioners deducted $ 8,601.50 as "Supplies" but accompanied such entry with the handwritten notation, "Sec. 174(a)." On Schedule C of their 1983 return, petitioners subtracted $ 51,841 from gross receipts as costs of materials and supplies with the accompanying notation, "Research: Sec. 174(a)." On Form 6765 "Credit for Increasing Research Activities," which accompanied their *354 1983 return, petitioners computed a credit under section 44F in the amount of $ 6,480. They utilized $ 273 of this credit on their 1983 return and carried back the remainder to prior years. By letter dated May 22, 1984, Internal Revenue Agent Wai Ling Lee (Agent Lee) notified petitioners that their 1981 return had been scheduled for examination and requested that supporting documents relating to the 1981 tax year (such as bank records, books, receipts, and invoices) be made available for examination on the scheduled date. By letter dated June 4, 1984, Internal Revenue Agent Jean Janich (Agent Janich), to whom the examination of petitioners' returns had been reassigned, notified petitioners that their 1982 return was selected for line-by-line examination under the Total Compliance Measurement Program, a program installed by the Internal Revenue Service to gauge taxpayer compliance. She requested that petitioners supply supporting documents for each line item on their 1982 tax return. Agent Janich also renewed Agent Lee's request for supporting documents and stated that it was her understanding that the examination was to take place on June 13, 1984. On June 13, 1984, Agent Janich *355 conducted a 4 to 6 hour examination of petitioners' returns at their home in Saratoga, California. During the audit Mr. Crouch supplied the documents which Agent Janich requested and discussed further his reasons for claiming the charitable deduction. During the course of the examination, Mr. Crouch did not mention his earlier claimed membership in the Universal Life Church but Agent Janich did learn of it through her own research. Mr. Crouch told Agent Janich that he had been through the courts before with respect to his attempts to withdraw from the social security system but did not specifically mention the District Court self-employment tax action. As a result of her examination of petitioners' returns, Agent Janich recommended that petitioners' claimed charitable deduction for the computed value of Mr. Crouch's social security benefits be disallowed, that amounts paid by petitioners which were claimed as a deduction for research and experimental expenditures be capitalized rather than deducted, that petitioners' credit for increasing research expenditures be disallowed, that Mr. Crouch be determined to be liable for tax on self-employment income earned during the years at issue, *356 and that the addition to tax for fraud under section 6653(b) be determined against petitioners. A closing conference was held in August 1984 between Mr. Crouch and Agent Janich but no agreement was reached. In addition to her recommendations regarding petitioners' returns, Agent Janich referred Mr. Crouch's case to the Office of the Director of Practice which monitors the behavior of agents enrolled to practice before the Internal Revenue Service. In 1987, as a result of her referral and after a hearing before an administrative law judge, Mr. Crouch was suspended from practice before the Internal Revenue Service for one year. On August 6, 1984, petitioners executed Forms 1040X "Amended U.S. Individual Income Tax Return" for their 1981 and 1982 tax years which they sent to Agent Janich. On their 1981 and 1982 amended returns, petitioners claimed that the value of the social security benefits which Mr. Crouch purportedly renounced was actually $ 169,929, rather than $ 88,583, based on a July 2, 1984 letter from the Social Security Administration, which informed Mr. Crouch that his monthly benefits in 1981 would have been $ 513, rather than $ 463. In addition, petitioners claimed *357 that the value of Mr. Crouch's benefits, and thus the amount of their purported contribution, should be increased by a "3% annual growth factor." Petitioners carried this increased amount over to their 1982 amended return. In the alternative, petitioners claimed that, since the purported charitable contribution was based on "future interests in intangible property," Mr. Crouch had a present interest in his 1981 social security benefits of $ 6,156 ($ 513/mo X 12 months). Petitioners then purported to assign this amount to the Internal Revenue Service as payment credit for any taxes they might owe for 1981. On their 1982 amended return, petitioners claimed (as an alternative) that, since the claimed charitable contribution was based on "future interests in intangible property," Mr. Crouch had a present interest in his 1982 social security benefits of $ 6,672 ($ 556/mo X 12 months), which petitioners attempted to assign in payment of taxes. On September 6, 1984, after the closing conference was held, petitioners filed a second set of amended returns for their 1981, 1982, and 1983 tax years. On these second amended returns, Mr. Crouch computed the amount of his self-employment tax liability *358 for his 1981, 1982, and 1983 tax years. Mr. Crouch paid these amounts along with interest under protest. In addition, on their 1984 return, petitioners computed and paid self-employment tax with respect to Mr. Crouch's 1984 self-employment income. Petitioners later filed an amended 1984 return on which they claimed that the self-employment tax for their 1984 tax year had been paid "under duress." On April 22, 1985, petitioners filed a third set of amended returns for their 1981, 1982, and 1983 tax years in which they claimed a refund for the taxes paid with respect to Mr. Crouch's self-employment income. They filed a similar amended return and claim for refund for their 1984 tax year. Respondent failed to act on petitioners' claims for refund within six months and petitioners filed an action for refund in the United States District Court for the Northern District of California. On April 16, 1987, the District Court granted respondent's motion to dismiss for failure to state a cause of action. Crouch v. United States, 665 F.Supp. 813 (N.D.Cal. 1987). Petitioners executed a Form 872-A "Special Consent to Extend the Time to Assess Tax" for each of their tax years 1981, 1982, and *359 1983 in which they extended indefinitely the time in which respondent was required to assess taxes due for such years. Respondent issued timely notices of deficiency for petitioners' 1978, 1980, 1981, 1982, and 1983 tax years in February and April 1988. In the stipulation filed at the trial of this case, petitioners conceded their liability for self-employment taxes in each of the years 1981, 1982, and 1983. Petitioners also conceded that as determined by respondent in the notice of deficiency they were not entitled to credits for increasing research activities under section 44F. On brief, petitioners conceded that they were not entitled to a charitable contribution deduction for Mr. Crouch's purported renunciation of social security benefits. OPINION The first issue for decision is whether petitioners may deduct currently expenses paid by Mr. Crouch to Hergie in connection with his attempts to publish his 25-title series of tax guides. Petitioners disclaim any reliance on section 162 for their contention that such amounts are currently deductible. They claim only that such amounts are currently deductible under section 174 as research and experimental expenditures. Although, *360 at trial, counsel for respondent stated as an alternative position that the expenses paid by Mr. Crouch are expenses of producing a book and, therefore, must be amortized under section 280, respondent does not argue this position on brief and appears to have abandoned the contention. Respondent argues that the expenses incurred by petitioners do not qualify for immediate deduction under section 174 or section 162, but must instead be capitalized under section 263 and then deducted over the useful life of the project. Section 174(a) provides that: (1) In general. -- A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.
Two prerequisites for the current deduction of expenditures under section 174 are immediately apparent from the quoted excerpt. First, the expenditures must be paid or incurred by the taxpayer during the taxable year "in connection with his trade or business." Second, the expenses must be "research and experimental expenditures" within the meaning *361 of section 174. If either requirement is not met, section 174 will not apply. Respondent argues that Mr. Crouch was not in the trade or business of being an author or publisher during the years at issue nor were the amounts paid by petitioners expended in connection with his trade or business of being an agent enrolled to appear before the Internal Revenue Service. Therefore, according to respondent, regardless of the nature of those expenditures, they are not deductible under section 174 because petitioners have failed to satisfy the first requirement of section 174. It is difficult to tell whether petitioner contends that he was in the business of being an author, since his primary argument is that the expenses he deducted were research and experimental expenses in connection with his return preparation business. In any event, we consider the evidence here to be clear that the deductions petitioners claim were not research and experimental expenses of his return preparation business. Petitioner did not plan to use the guides in his return preparation business, but rather to sell them to any persons he could. Whether petitioner was engaged in the business of being an author is *362 a closer question. Whether a particular activity constitutes a trade or business of a taxpayer is a question of fact. Commissioner v. Groetzinger, 480 U.S. 23, 36 (1987); Higgins v. Commissioner, 312 U.S. 212, 217 (1941).In order to be engaged in a trade or business with respect to a particular activity, a taxpayer must be engaged in such activity with continuity and regularity. Furthermore, his primary motive in engaging in such activity must be to realize income or profit. Commissioner v. Groetzinger, supra at 35; Independent Electric Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Snyder v. United States, 674 F.2d 1359, 1363-1364 (10th Cir. 1982); Polakis v. Commissioner, 91 T.C. 660, 669 (1988) (quoting Commissioner v. Groetzinger, supra); Smith v. Commissioner, 91 T.C. 733, 764 (1988).Although a taxpayer's profit expectations need not be realistic, they must be genuinely held. Snyder v. United States, supra at 1363; DePinto v. United States, 585 F.2d 405 (9th Cir. 1978); Gestrich v. Commissioner, 74 T.C. 525, 529 (1980).A taxpayer can be engaged in more than one trade or business at any one time. Snyder v. United States, supra at 1363; *363 Polakis v. Commissioner, supra at 670; Gestrich v. Commissioner, supra at 529. First, several factors indicate that petitioner was in the trade or business of being an author. Petitioner was definitely in the business of being a tax return preparer and thus should have had some knowledge of the subject matter of his guides. Second, although petitioner testified that he wrote in his spare time, he expended a substantial amount of time and effort on each of the five 250-page guides which he completed. Third, petitioner spent the sums set forth in our findings over the period here involved as payments to Hergie for expenses such as editing, graphics, design, and printing. Fourth, he contacted numerous publishers in an attempt to find someone who would provide financial backing for the mass marketing of the guides. Fifth, although petitioner testified that his book sales in 1981, 1982, and 1983 were not in the ordinary course of business, he did actually sell at least 68 guides during this 3-year period and distributed other guides as samples. All these actions indicate that petitioner expected that his efforts would result in the successful and profitable exploitation of his works. *364 There appears to be no element of personal pleasure in petitioner's work on the guides nor any indication that the project was a hobby. It is the type of project that a taxpayer could only be expected to engage in if he had some genuine hope that, at some point in the future, his efforts would be financially rewarded. Under these circumstances, the fact that no immediate profits resulted from petitioner's activity is not determinative. Snyder v. United States, supra at 1363; Gestrich v. Commissioner, supra at 529.We conclude that petitioner was in the trade or business of authoring tax guides during 1981, 1982, and 1983. Respondent next argues that even if petitioner was in the business of authoring books, the amounts which he expended were not "research and experimental expenditures" with respect to his trade or business of being an author within the meaning of section 174. Section 1.174-2(a), Income Tax Regs., provides that: (1) The term "research or experimental expenditures", as used in section 174, means expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense. The term *365 includes generally all such costs incident to the development of an experimental or pilot model, a plant process, a product, a formula, an invention, or similar property, and the improvement of already existing property of the type mentioned. The term does not include expenditures such as those for the ordinary testing or inspection of materials or products for quality control or those for efficiency surveys, management studies, consumer surveys, advertising, or promotions. However, the term includes the costs of obtaining a patent, such as attorneys' fees expended in making and perfecting a patent application. On the other hand, the term does not include the costs of acquiring another's patent, model, production or process, nor does it include expenditures paid or incurred for research in connection with literary, historical, or similar projects. * * * Respondent claims the amounts paid to Hergie by petitioner do not fall within the purview of the quoted regulation, and, therefore, are not deductible under section 174. Respondent argues that the amounts expended by petitioner are not research costs in the experimental or laboratory sense nor are they costs incident to the development *366 of a pilot model, plant process, product, formula, or invention. According to respondent, the amounts expended by petitioner were paid to research, write, publish and promote an ordinary literary work - a series of books - nothing more, nothing less. Therefore, respondent argues such amounts should be capitalized under section 263 and deducted over the income-producing life of the books. Petitioners point out that the amounts claimed as deductions were paid to cover the costs of editing, graphics, design, and printing costs, not literary research. Furthermore, petitioners argue that the term "literary, historical, or similar projects" refers to literary, cultural and artistic works having excellence of form and long life. They contend that the authoring of highly technical and annually obsolete tax books can hardly be classed as "literary." They contend that what Mr. Crouch produced was akin to a tax software package aimed at a completely new and untapped market, the professional-level taxpayer. We note that for purposes of U.S. copyright law, a "literary work" is defined very broadly to include any work expressed in words or numbers, regardless of the nature of the material object *367 (i.e., a book, periodical, manuscript, phonorecord, film, tape, disk, or card) in which it is embodied. 17 U.S.C. sec. 101 (1988). However, we need not decide whether petitioner's guides were "literary works" as that term is used in section 1.174-2(a), Income Tax Regs., since we agree with petitioners that none of the amounts expended were paid for research for their guides. The record is clear, and we conclude, that the vast majority of the amounts paid to Hergie were prepublication expenses paid for services relating to the editing, proofing, designing, and printing of Mr. Crouch's tax books. Only a small amount was paid for items (i.e., computer paper, letterheads, envelopes) which could, even remotely, be considered research or experimental items and the record does not show that these items did fall in that category. Under section 1.174-2(a)(1), Income Tax Regs., it is clear that, in order to be deductible under section 174, the amounts expended must "represent research and development costs in the experimental or laboratory sense." (Emphasis supplied.) While, in a sense, the amounts in question were paid by petitioner to develop a new version of an existing product (a series *368 of tax guides aimed at a different set of consumers than traditional tax books), we conclude they were not research and development costs in the experimental or laboratory sense. Books, and the technology required to produce them, have been in existence for centuries. Petitioner did not improve on such technology; he merely produced a different type of book. Petitioners' attempt to characterize the end product of Mr. Crouch's efforts as a "computer software series of Federal tax guides" and the book samples as "hard-copy prototypes." The term "computer software" is commonly defined as "written or printed data, such as programs, routines, and symbolic languages, essential to the operation of computers," or "any of the written programs, flow charts, etc., that may be inserted in computer programs." American Heritage Dictionary, Second College Edition (1982); Random House College Dictionary (1980). Under U.S. copyright law, a computer program is defined as a "set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. sec. 101 (1988). In other words, a computer program instructs a computer on how to perform *369 certain essential tasks (word processing, graphics, columns, tables, storage, retrieval, etc.) which allow the composition, structure, document storage, and document retrieval of information on computer disks in whatever form the user chooses. The desk-top publishing software which petitioner used to write his tax guides is a computer program. The data which petitioner chose to store on his computer disks (i.e., his tax guides) is no more "computer software" than any document prepared on a computer disk. This is the case even though petitioner's disks may have simplified the publishing process for one or more potential publishers. We thus conclude that the amounts expended by petitioner were not research or experimental expenditures within the meaning of section 174. According to petitioner's own testimony, he paid Hergie to edit, proof, design, and print his guides in order to have samples on hand to distribute to customers and publishers. His avowed purpose for distributing the samples was to gain consumer feedback on his guides and to promote the publication of the entire series. Amounts expended for "consumer surveys, advertising, or promotions," are not deductible under section *370 174. Section 1.174-2(a)(1). Thus, we conclude that petitioners' prepublication expenditures are not deductible under section 174. We have considered the various cases cited by the parties dealing with claimed deductions by authors or publishers. Most of those cases concern a claimed deduction under section 162 or capitalization under section 280, and not deductions claimed under section 174. Both Hadley v. Commissioner, 819 F.2d 359 (2d Cir. 1987), revg. Garrison v. Commissioner, 86 T.C. 764 (1986), and Encyclopaedia Brittanica v. Commissioner, 685 F.2d 212 (7th Cir. 1982), revg. a Memorandum Opinion of this Court, which were cited by the parties, deal with deductibility of expenses under 162. The Garrison case also deals with the provisions of section 280. Neither section 162 nor section 280 are involved in the instant case as pointed out above. For this reason, we consider it unnecessary for purpose of this case to discuss or attempt to reconcile these opinions. Respondent has determined that the amount expended in connection with preparing each tax guide for publication must be capitalized under section 263 and deducted over the useful life of that guide. We conclude that *371 petitioners have failed to show error in this determination. The next issue for decision is whether petitioners are liable for additions to tax for fraud under section 6653(b) for their 1981 taxable year and section 6653(b)(1) and (2) for their 1982 and 1983 taxable years, because a portion of their underpayment of tax in each year was due to fraud with intent to evade tax. [4] *372 *373 Whether a taxpayer is liable for the addition to tax for fraud is a question of fact to be determined from the entire record. Edelson v. Commissioner, 829 F.2d 828, 832 (9th Cir. 1987), affg. a Memorandum Opinion of this Court; Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Meier v. Commissioner, 91 T.C. 273, 297 (1988).Respondent has the burden of proving fraud by clear and convincing evidence. Section 7454(a); Edelson v. Commissioner, supra at 832; Castillo v. Commissioner, 84 T.C. 405, 408 (1985); Rule 142(b). Fraud is intentional wrongdoing on the part of a taxpayer with the specific intent to evade a tax known to be owing. Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Akland v. Commissioner, 767 F.2d 618, 621 (9th Cir. 1985); Zell v. Commissioner, 763 F.2d 1139, 1143 (10th Cir. 1985), affg. a Memorandum Opinion of this Court. Thus, respondent must show that petitioners intended to evade taxes they knew or believed were owing by engaging in conduct intended to conceal, mislead, or otherwise prevent, the collection of such taxes. Kotmair v. Commissioner, 86 T.C. 1253, 1259 (1986); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Fraud will never be presumed; however, since direct proof of a taxpayer's fraudulent intent is not readily available, fraud may be proven through circumstantial *374 evidence and reasonable inferences which can be drawn therefrom. Edelson v. Commissioner, supra at 832; Akland v. Commissioner, supra at 621; Meier v. Commissioner, supra at 297.The Ninth Circuit Court of Appeals, to which the instant case is appealable, has identified certain types of circumstantial evidence from which fraudulent intent may be inferred. Such "badges of fraud" include: (1) understatements of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; and (6) failure to cooperate with tax authorities. Edelson v. Commissioner, supra at 832; Meier v. Commissioner, supra at 298-299. Respondent claims that several such indicia, as well as other indications of fraud, are present in the instant case and, that he has met his burden of proving fraud by clear and convincing evidence. Respondent notes that both petitioners are highly educated individuals and that Mr. Crouch, in particular, is well versed in tax law. Respondent argues that petitioners claimed a substantial charitable contribution deduction in 1981, 1982, and 1983 and failed to pay self-employment taxes based on Mr. *375 Crouch's attempted withdrawal from the social security system, even though they knew, based on their prior experience and knowledge, that such attempt would fail. Respondent also claims that petitioners concealed relevant facts (i.e., that Mr. Crouch had previously attempted to exempt himself from the social security system) and misled the Internal Revenue Service (i.e., by showing Agent Janich thank you letters from various Congressmen rather than disapproval letters from the Social Security Administration) during the audit of their returns. We conclude that the evidence in this case is insufficient to carry respondent's burden of proving fraud by clear and convincing evidence. While it is true that Mr. Crouch studied to become a return preparer, prepared tax returns for compensation, and attempted to publish tax guides, he is not a lawyer. While it is clear to the Court that petitioner's claimed charitable deduction for a purported contribution of his lifetime social security benefits is frivolous, it is not as clear that petitioner claimed this erroneous deduction with intent to evade tax. According to the testimony of Agent Janich, Mr. Crouch cooperated with her during her audit *376 of petitioners' returns to the extent of supplying all books and records for which she asked. Mr. Crouch did not disclose his prior attempts to withdraw from the social security system to the agent during the audit, but there is no indication the agent asked for this information. Agent Janich knew of, or became aware of, this fact prior to completion of the audit. While Mr. Crouch, as a return preparer, should have known that he had not made a gift of his lifetime social security benefits as claimed on his return, the record is not clear that, in fact, he did completely understand the frivolous nature of this contention. The instant case is distinguishable from the recent "tax protestor" cases which have held that a taxpayer cannot avoid the imposition of the fraud additions by openly disclosing his intentions to evade taxes. E.g., Edelson v. Commissioner, 829 F.2d 828 (9th Cir. 1987), affg. a Memorandum Opinion of this Court; Granado v. Commissioner, 792 F.2d 91 (7th Cir. 1986), affg. a Memorandum Opinion of this Court. One of these cases involved a claim by the taxpayer that wages were not taxable although the error of this position had been unmistakenly pointed out to him. *377 The other involved a claim that only amounts received in gold or silver were income. Both involved willful failure to file returns. Both involved filing of false W-4 Forms. Both the Ninth and Seventh Circuit Courts of Appeal held that the fact that the taxpayer in each case disclosed his defiance of the tax laws did not prevent the imposition of the fraud addition. The major indication of fraud in the instant case is petitioner's persistent attempt to avoid payment of self-employment tax. The record shows that, in 1974 and 1975, Mr. Crouch perjured himself by certifying that he was a member of a church with which he admittedly had no connection in order to attempt to gain exemption from self-employment tax. However, these years are not before the Court in this case. Fraud is determined on a year-by-year basis. Mr. Crouch's falsifying a claim for exemption from self-employment tax in a prior year, although raising suspicions of fraudulent intent in the current years, is not clear evidence of fraud in the current years. We do not agree with petitioners that Mr. Crouch's disclosure of his claimed deduction for his claimed lifetime social security benefits precludes a finding of *378 fraud. However, on the basis of this record, we conclude that respondent has not shown fraud by clear and convincing evidence. Gross negligence or a suspicion of fraud is not sufficient. Although respondent has failed to carry his burden of proving fraud, it is clear from this record that the addition to tax under section 6653(a) is due for 1978 and 1980, and that respondent has proved his alternative allegations that the addition to tax under section 6653(a)(1) is due for 1981, 1982, and 1983. [5] Petitioners were negligent and intentionally disregarded the rules and regulations when they failed to pay self-employment tax on Mr. Crouch's self-employment income when they filed their returns. They had been given sufficient notice of the fact that they were not exempt from this tax. The failure to report this tax on their returns was clearly negligent. Mr. Crouch was aware, through his contacts with Congressman Mineta's office and the Social Security Administration, that there was no provision in the law for the lump-sum gifting of one's social security benefits. Mr. Crouch was also aware, through his own research, that any gift to the Social Security Trust Fund would have to be *379 accepted by the Managing Trustee. Mr. Crouch must have also been aware that there was no provision in the Internal Revenue Code for the deduction of such a lump-sum "gift" to social security since he proposed an amendment to the Internal Revenue Code to add such a provision. Yet, despite all of this knowledge, petitioners claimed to have made a gift and attempted to deduct its claimed value on their returns. They did so even though they received no notification of acceptance and, in fact, received several letters which rejected outright Mr. Crouch's proposed Code section and strongly implied that the purported lump-sum gift would not be accepted. Even the value of the purported "gift" was grossly inflated because petitioners failed to reduce Mr. Crouch's future benefits to their present value. The fact that petitioners paid the portion of Mr. Crouch's self-employment tax that was computed by them "under protest" after the returns were filed, but prior to the issuance of the notices of deficiency, does not cause the failure to report this tax on the returns as filed not to be due to negligence. In addition, petitioners were negligent in claiming a charitable contribution for a *380 purported gift of Mr. Crouch's lifetime social security benefits after being informed such a gift could not be made. Petitioners *381 argue that additions to tax under section 6653(a) and section 6653(a)(1) should not be imposed because they were merely testing a legal position (e.g., that a self-employed person should be allowed to take care of his own retirement needs). In support of their argument, they cite the case of Druker v. Commissioner, 77 T.C. 867 (1981), affd. in part and revd. in part 697 F.2d 46 (2d Cir. 1982), in which we held that the taxpayers, husband and wife, should not be penalized under section 6653(a), even though they intentionally applied the rate of tax applicable to single persons on their 1975 and 1976 returns in an effort to litigate the constitutionality of the "marriage penalty." In that case, however, we emphasized that the taxpayers' position was neither frivolous nor meritless despite the fact that it had been rejected in two other cases. Druker v. Commissioner, supra at 875.In addition, it is not clear that the decisions in the two other cases had become final prior to the time the taxpayers filed their 1975 and 1976 returns. This holding was reversed by the Second Circuit Court of Appeals, but we need not discuss the reversal since we conclude that the instant case is distinguishable *382 from Druker v. Commissioner, supra, and, therefore, our holding therein is inapplicable to this case. In the instant case, petitioners' position is clearly meritless. Mr. Crouch's prior attempts to withdraw from the social security system were specifically rejected by the District Court, at least with respect to the payment of self-employment tax, prior to the time petitioners filed their 1981, 1982, and 1983 returns. There was no reasonable basis for the actions taken by petitioners in this case with respect to their claims of exemption from employment tax and a claimed deduction for social security benefits. Therefore, the imposition of the addition to tax under section 6653(a) for 1978 and 1980, and under section 6653(a)(1) for 1981, 1982, and 1983, is clearly shown from this record. The section 6653(a)(2) additions to tax for the years 1981, 1982, and 1983, are also appropriate with respect to the underpayment resulting from petitioners' failure to report on their return self-employment tax and their attempt to deduct, as a charitable contribution, the lump-sum value of Mr. Crouch's lifetime social security benefits for the reasons stated with respect to section 6653(a) and *383 section 6653(a)(1). However, we conclude that the addition to tax under section 6653(a)(2) is not applicable to the portion of the underpayment due to the claimed section 174 deductions. This deduction was dependent on a legal determination that was not completely clear and it was not unreasonable for petitioners to claim this deduction. Since respondent affirmatively alleged the additions to tax under section 6653(a)(2), respondent is not entitled to this addition with respect to the items conceded by petitioners, since he has failed to prove that petitioners' claiming of such deductions or credits was due to negligence. The final issue for decision is whether petitioners are liable for an addition to tax under section 6661 for their 1982 and 1983 tax years. Section 6661 provides that, if a taxpayer substantially understates his income tax liability, an addition to tax equal to 25 percent of the amount of any underpayment attributable to such understatement will be imposed. Section 6661(a). Under section 6661(b)(2)(A), an "understatement" is defined as the amount of tax which should have been shown on a taxpayer's return reduced by the amount of tax which was shown on his return. *384 Section 6661(b)(2)(B) further provides that: (B) REDUCTION FOR UNDERSTATEMENT DUE TO POSITION OF TAXPAYER OR DISCLOSED ITEM. -- The amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to -- (i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or (ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or a statement attached to the return.
Internal Revenue Code provisions (as well as other statutory provisions), Congressional intent as evidenced by legislative history, temporary and final regulations, court cases, administrative pronouncements (including revenue rulings and procedures), and tax treaties, can be considered authority for a taxpayer's position under section 6661(b)(2)(B)(i). H. Rept. 97-760 (Conf.)(1982), 1982-2 C.B. 600, 650; section 1.6661-3(b)(2), Income Tax Regs.; Antonides v. Commissioner, 91 T.C. 686, 702 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Schirmer v. Commissioner , 89 TC. 277, 284 (1987).Substantial authority exists for a taxpayer's treatment of *385 an item where the weight of authorities supporting the taxpayer's position are substantial in comparison to the weight of authorities supporting contrary positions. H. Rept. 97-760 (Conf.)(1982), 1982-2 C.B. 600, 650; section 1.6661-3(b)(1), Income Tax Regs.; Antonides v. Commissioner, supra at 702; Schirmer v. Commissioner, supra at 283. We conclude that there was substantial authority for petitioners' treatment of the amounts paid to Hergie as research and experiemental expenditures under section 174. In Rev. Rul. 73-395, 1973-2 C.B. 87, the Internal Revenue Service held that prepublication costs incurred by a taxpayer, who was in the business of creating, publishing and distributing textbooks and visual aids in the writing, editing, design, and artwork of a textbook should be capitalized rather than deducted under section 174 as research and experimental expenditures. In this Revenue Ruling, it is specifically stated that "The Service will not follow the decision * * * in the case of Stern v. United States, 1971-1 USTC 86,419 [C.D. Cal. 1971] holding that a taxpayer, in the business of writing books, could deduct traveling expenses incurred while researching, writing, and arranging *386 material for a book." The Stern case held the expenses involved to be deductible under section 162, but Rev. Rul. 73-395 did not distinguish between this basis for deduction and deduction under section 174, which in general permits election to deduct certain expenses which otherwise would be capitalized. In section 2119, Tax Reform Act of 1976 (TRA 76), Pub. L. 94-455, 90 Stat. 1912, Congress expressed its dissatisfaction with Rev. Rul. 73-395, supra. Section 2119(a) of TRA 76 provided that sections 61, 162, 174, 263, and 471 were to be applied to "prepublication expenditures" without regard to Rev. Rul. 73-395 and in the manner the taxpayer had consistently applied such sections prior to the issuance of Rev. Rul. 73-395. While Rev. Rul. 73-395 involved a taxpayer in the business of publishing and distributing, as well as creating, it did deal with prepublication expenditures. We have concluded in this case that the prepublication expenses here involved were not deductible under section 174 by an author, since they were not research and experimental expenditures within the meaning of section 174 paid in connection with petitioner's trade or business. However, we conclude that Congress' *387 repudiation of Rev. Rul. 73-395 could be construed as authority for petitioners' position. In a situation such as the present, we conclude that there was substantial authority for petitioners' deduction under section 174 of the amounts he paid to Hergie. In contrast, it is clear that no authority, much less substantial authority, existed or exists for Mr. Crouch's failure to pay self-employment tax at the time petitioners filed their 1982 and 1983 returns or for petitioners' lump-sum deduction of Mr. Crouch's claimed future social security benefits. Petitioners repeatedly and candidly state on brief that, "there is no precedent for their position with respect to Sec. 170(c)(1) * * *." Mr. Crouch admitted as much when he proposed his new Code section authorizing the very actions he undertook. Petitioners are, therefore, liable for the addition to tax under section 6661 with respect to the understatement of tax resulting from failure to report self-employment tax on their return and the claimed deduction for petitioner's social security benefits, unless they adequately disclosed the facts affecting their tax treatment of these items on their return. Section 1.6661-4(b), Income Tax Regs., *388 provides that disclosure in an attached statement will be adequate with respect to the tax treatment of an item, if it is made: 1) on a properly completed Form 8275, or 2) in a statement attached to the return which contains a caption identifying it as a section 6661 disclosure, an identification of the item disclosed and its amount, and the facts affecting the treatment of the item which reasonably could be expected to apprise the Internal Revenue Service of the potential controversy or legal issue surrounding the item. In the instant case, petitioners failed to attach a Form 8275 to their return and the materials they did attach do not comply with the requirements of section 1.6661-4(b). For example, the renunciation letter attached to petitioners' returns contains no section 6661 disclosure caption. Furthermore, the renunciation letter to President Reagan contains no reference to the deduction which was claimed by petitioners or an explanation of how the amount of such deduction was determined. Despite their failure to attach an adequate statement to their return, petitioners may still be entitled to relief under section 6661(b)(2)(B)(ii) if they made adequate disclosure on the *389 return itself. According to section 1.6661-4(c): The Commissioner may by revenue procedure prescribe the circumstances in which information provided on the return in accordance with the applicable forms and instructions will be adequate disclosure for purposes of section 6661.
See also H. Rept. 97-760 (Conf.) (1982), 1982-2 C.B. 600, 650. Both Rev. Proc. 83-21, 1983-1 C.B. 680 (for returns due after December 31, 1982) and Rev. Proc. 84-19, 1984-1 C.B. 433 (for returns due after December 31, 1983) provide, in general, the circumstances under which disclosure on a taxpayer's return of an item or a position taken, with no specific reference to section 6661, will constitute adequate disclosure for purposes of reducing an understatement in accordance with section 6661(b)(2)(B)(ii). A claim of exemption from self-employment tax is not encompassed by either revenue procedure. However, both revenue procedures provide that the proper completion of those lines relating to charitable contributions on Schedule A, Form 1040, Itemized Deductions, in accordance with the instructions thereto will, without more, constitute adequate disclosure for purposes of section 6661. In the case of a non-cash *390 charitable contribution, the disclosure will be adequate only if the taxpayer attaches to the return the statement required under section 1.170A-1(a)(2)(ii), Income Tax Regs. Such section (prior to redesignation as section 1.170A-13(d)(2), Income Tax Regs. by T.D. 8002, 1985-1 C.B. 60, 63), required the taxpayer to supply, in a statement attached to the return, such information as the name and address of the recipient of the non-cash contribution, the date of the contribution, a description of the property, the date of and method by which the taxpayer acquired the property, the fair market value of the contribution and the method by which such value was determined, an appraisal report (if any), etc. In the instant case, petitioners have failed to comply with the requirements of Rev. Proc. 83-21, supra, and Rev. Proc. 84-19, supra. To begin with, they did not properly complete Schedule A, Itemized Deductions, on either their 1982 or 1983 joint returns. On each return, they entered the carryover from their purported 1981 contribution of Mr. Crouch's social security benefits as a cash charitable contribution, even though Mr. Crouch at no time received cash benefits from the Social Security *391 Administration, and at no time donated such cash to the social security trust fund. Petitioners, thus, failed to disclose the non-cash nature of their charitable contribution. Even assuming they had properly entered the value of Mr. Crouch's social security benefits as a non-cash contribution on their Schedules A, the purported renunciation letter which they attached to their returns falls far short of the statement required by section 1.170A-1(a)(2)(ii). It contained no reference to a charitable deduction as such, no reference to the value of the purported contribution, and no reference to the method by which such value was determined. Because petitioners have failed to comply with the requirements of adequate disclosure contained in the above-cited revenue procedures, they are not entitled to relief under section 1.6661-4(c), Income Tax Regs.
Even though petitioners did not make specific references to section 6661 and failed to comply with the requirements for adequate disclosure under section 1.6661-4(c), Income Tax Regs., they may nevertheless satisfy the requirements of adequate disclosure under section 6661(b)(2)(B)(ii), if they provided information with their return which *392 is sufficient to enable respondent to identify the potential controversy involved. S. Rept. 97-494 at 274 (1982); Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987).Based on the facts in this record and for the reasons stated previously, we conclude that petitioners did not provide sufficient information with their return to enable respondent to identify the potential controversy involved with respect to their attempted deduction of Mr. Crouch's social security benefits. While it is true that, on both their 1982 and 1983 return, petitioners referred to their 1981 Federal income tax return (on which they at least made reference to the purported section 170(c)(1) contribution of social security entitlement), section 6661 does not apply to their 1981 Federal income tax return and, thus, petitioners were required to completely disclose the facts surrounding the treatment of the charitable contribution carryover on their 1982 and 1983 returns as well. Section 1.6661-4(d), Income Tax Regs. Furthermore, the cryptic references in Mr. Crouch's purported renunciation letter to recapture of "a 1981 income tax credit under the precepts of Sections 1016 (adjustments to basis), 1033 (involuntary *393 conversions), 1231 (property used in a trade or business), and others, of the Internal Revenue Code," is hardly more than a clue that petitioners would attempt to deduct the inflated value of Mr. Crouch's benefits as a cash charitable contribution on their 1982 and 1983 returns. Schirmer v. Commissioner, supra at 286 note 7.[6]
In contrast, petitioners provided much more than a clue with respect to Mr. Crouch's refusal to pay self-employment tax. Petitioners attached a Schedule SE, "Computation of Social Security Self-Employment Tax," to their return for each of the years 1982 and 1983 in which they reported no self-employment tax due, even though they showed self-employment income (and loss). On each Schedule SE, they referred specifically to an "attached statement." This "attached statement" (which, at least on their 1982 return was also denominated as a Schedule SE) was a copy of Mr. Crouch's purported renunciation letter in which Mr. Crouch specifically stated that, "Henceforth, no further compulsory Social Security taxes will be paid by me, the undersigned, inasmuch as the benefits therefrom, by virtue of this irrevocable *394 renunciation, can never be claimed." We conclude that the notations on petitioners' 1982 and 1983 returns, when combined with the purported renunciation letter attached thereto, enabled respondent to identify the potential controversy surrounding such item, and, therefore, we conclude that the understatement must be reduced by the self-employment tax so excluded. The section 6661 addition was determined by respondent in the notice of deficiency and, therefore, the burden is on petitioner to show error in this determination. Petitioner has made no showing of any basis for reducing any understatement with respect to items he conceded. Therefore, these items are includable in determining the substantial understatements. If, after recomputation in accordance with this opinion, the amount of the underpayment is such that a substantial understatement exists, petitioners will be liable for the section 6661 addition to tax on such substantial understatement for 1982 and 1983. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent issued a joint notice of deficiency covering petitioners' 1978, 1980, 1982, and 1983 taxable years. The deficiencies determined for petitioners' 1978 and 1980 taxable years relate solely to petitioners' carryback of a tentative credit for research and development expenses claimed to have been incurred in their 1981 and 1983 taxable years. The deficiency for the taxable year 1981 is based on separate notices of deficiency issued to petitioner Holmes F. Crouch and Irma J. Crouch, although they filed a joint return for 1981.
*. This is the determination in the notices of deficiency although for 1982 and 1983, section 6653(b) is divided into (1) and (2).↩
3. Sec. 208(a) of the Social Security Act Amendments of 1950, Ch. 809, 64 Stat. 540 added a new Subchapter E (section 480 through 482) to the Internal Revenue Code of 1939. Subchapter E provided, for the first time, that the "self-employment income of every individual" would be subject to tax. Sec. 109(a)(2) of the Social Security Act Amendments of 1950, Ch. 809, 64 Stat. 521 amended sec. 201(a) of the Social Security Act (now 42 U.S.C. sec. 401(a) (1973)↩) to provide that 100 percent of the taxes imposed by new Subchapter E of the Internal Revenue Code of 1939 were to be appropriated to the Federal Old-Age and Survivors Insurance Trust Fund.
4. As applicable to the year 1981, sec. 6653(b) provides: (b) FRAUD. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. In sec. 325(a) of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA 1982), Pub. L. 97-248, 96 Stat. 616, Congress amended sec. 6653(b) to read as follows: (b) FRAUD. -- (1) IN GENERAL. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. (2) ADDITIONAL AMOUNT FOR PORTION ATTRIBUTABLE TO FRAUD. -- There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to fraud, and (B) for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax). The amendments made by sec. 325(a) apply with respect to taxes, the last day prescribed for payment of which (determined without regard to any extension), is after September 3, 1982. Thus, section 6653(b), as amended by TEFRA 1982, applies to petitioners' 1982 and 1983 tax year.↩
5. Sec. 6653(a) provided: (a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME, GIFT, OR WINDFALL PROFIT TAXES. -- (1) IN GENERAL. -- If any part of any underpayment (as defined in subsection (c)(1)) * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. (2) ADDITIONAL AMOUNT FOR PORTION ATTRIBUTABLE TO NEGLIGENCE, ETC. -- There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to negligence or intentional disregard referred to in paragraph (1), and (B) for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax).↩
6. See also Schmidt v. Commissioner, T.C. Memo. 1989-188↩.